# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

---

**BRUCE TERRELL DAVIS,**

> **Petitioner,**

> **v.**                                             **Case No. 23-CV-336-SCD**

**TIM THOMAS,**[1]
*Warden, New Lisbon Correctional Institution,*

> **Respondent.**

---

# DECISION AND ORDER
# DENYING PETITION FOR WRIT OF HABEAS CORPUS

---

Bruce Davis was stopped by Milwaukee police and subsequently arrested after he stepped off a porch in a neighborhood that had been plagued by residential burglaries committed by a man that generally matched Davis's description. A few weeks later, after prints recovered from the burglarized homes matched Davis's prints and several of the break-in victims picked Davis's picture out of a photo array, Davis was charged with several burglaries and other, related crimes. Prior to trial, Davis moved to suppress evidence recovered from his arrest—his identity and his prints—arguing that the police violated the Fourth Amendment because the initial stop was not supported by reasonable suspicion. The trial court denied the motion following an evidentiary hearing, and at trial the prosecution introduced the print evidence and the photo array evidence. During deliberations, the jury

---

[1] Tim Thomas is now the warden of New Lisbon Correctional Institution, where Davis is in custody. Accordingly, the clerk of court shall substitute Thomas for Lizzie Tegels as the named respondent in this action. *See* Fed. R. Civ. P. 25(d); *see also* Rule 2(a) of the Rules Governing Section 2254 Cases in the United States District Courts.

asked to see two of the arrays. After listening to suggestions from the parties, the trial court removed the photos from one of the arrays from their folders and sent the jury only the loose photos. The prosecution had not introduced into evidence the folders for the other array, and the trial court thought it best that the jury view both arrays in the same form. The jury convicted Davis on all counts.

Davis moved for a new trial, arguing (among other things) that the officer who testified at the suppression hearing committed perjury and that the trial court violated his due process rights in the way it handled the photo array evidence. The circuit court denied the motion following another evidentiary hearing, finding that the officers' testimony at the second hearing was more credible than Davis's testimony and that the trial court did not err in sending the jury only the loose photos from the two arrays. On appeal, the state appellate court determined that the circuit court's credibility determinations were not clearly erroneous and that the trial court's decision to provide the jury with only the loose photos did not violate Davis's right to present a defense. The state supreme court declined further review.

Davis now seeks relief under 28 U.S.C. § 2254, claiming that he is in custody in violation of his Fourth Amendment right to be free from an unreasonable seizure and his due process right to present a defense. Because the state courts afforded Davis a full and fair opportunity to litigate his Fourth Amendment claim, I am precluded from reviewing the merits of that claim on federal habeas review. Moreover, because the state court's decision denying his due process claim was not objectively unreasonable, Davis is not entitled to relief under § 2254 on that claim. I will therefore deny the petition and dismiss this action.

2

## BACKGROUND

In early fall 2011, the Milwaukee police were investigating a series of daytime residential burglaries occurring on the east side of the city. *See* Respt's Answer Ex. 3, ¶ 3, ECF No. 6-3. The burglar's modus operandi was to knock on doors to see if anybody was around, enter the residence, and take a valuable item like a laptop. *See id.*; *see also* Respt's Answer Ex. 9, at 13:6–8, ECF No. 6-9. The most recent victim—or, as it turned out, attempted victim (the resident confronted the suspected burglar, and he left without taking anything)—described the burglar as a black male, in his mid-30s, approximately 6'1" tall, weighing about 170 pounds, and wearing a Minnesota Gophers letterman jacket. *See* Ex. 9, at 9:21–10:3, 17:8–24.

While out looking for the burglar during the afternoon of October 3, 2011, the police observed a man knocking on the door of a residence in the same area as the previous burglaries. Ex. 3, ¶¶ 3, 7; Ex. 9, at 21:5–7. The police made contact with that individual, and he identified himself as Bruce Davis. Ex. 3, ¶¶ 7–8. A records check revealed that Davis had an outstanding warrant, so the police arrested him. Subsequent investigation connected Davis to the burglaries. Several prints lifted from the break-ins matched Davis's prints. Ex. 3, ¶ 14. Also, three of the four victims—referred to by the pseudonyms Charles, Margaret, and Oliver—purportedly picked Davis's picture out of a photo array. *See* Ex. 3, ¶¶ 1 n.1, 14.

## I. State Pretrial and Trial Proceedings

The State of Wisconsin charged Davis with robbery, criminal trespass to a dwelling, and three counts of burglary. *See* Ex. 3, ¶ 3 & n.2. Prior to trial, Davis moved to suppress the evidence recovered from his arrest (i.e., his identity and his prints), arguing that the police lacked reasonable suspicion to stop him. Ex. 3, ¶ 4. He also moved to suppress the identification made by Margaret, claiming it was unreliable. Ex. 3, ¶ 5. The trial court held

evidentiary hearings on each motion. *See* Ex. 3, ¶¶ 6–12; *see also* Ex. 9; Respt's Answer Ex. 10, ECF No. 6-10.

Milwaukee police officer Michael Murphy and Davis testified at the hearing on the stop motion. Murphy said that he was on patrol looking for the burglar on October 3, 2011, when he observed "an individual matching the description of what had been occurring recently" standing on the porch of a residence. Ex. 9, at 11:1–23. Murphy indicated that several other officers responded "almost simultaneous" to him, as they were also in the area looking for the burglar. Ex. 9, at 22:3–7, 27:6–28:11. According to Murphy, the individual on the porch turned and started walking down the steps when he saw the police. Ex. 9, at 13:13–14:6. Murphy asked the person to show his hands, identify himself, and explain what he was doing at the residence. Ex. 9, at 11:17–12:3. Davis gave the police his photo I.D. and told them he was at the residence to speak to a certain individual. Ex. 9, at 12:9–16, 13:3–12. Murphy said checked with the residents, and they told him that the individual Davis claimed to be visiting didn't live there and that they didn't know Davis. Murphy insisted that none of the officers drew their firearms or demanded Davis to get on the ground. Ex. 9, at 12:7–8, 21:8–22:2, 31:2–5.

Davis had a very different story to tell. Davis testified that he was at the residence on October 3 because he lost his cell phone the previous night and thought he could have left it at that residence. Ex. 9, at 35:21–36:24. According to Davis, after walking down the porch steps, Milwaukee police officer James Hernandez approached him with his gun drawn and ordered Davis to get on the ground. Ex. 9, at 36:25–38:12. Davis said that, after complying with the order, Hernandez placed his foot on Davis's back and asked Davis what he was doing in the area. Ex. 9, at 38:13–39:21. Davis indicated that Officer Murphy arrived at the scene

4

while Davis was on the ground being questioned by Hernandez and that Murphy took Davis's wallet from his back pocket to retrieve his I.D. Ex. 9, at 38:25–40:12.

The State recalled Officer Murphy after Davis testified. Murphy indicated that he and Officer Hernandez were both at the scene on October 3 and that they approached Davis simultaneously. Ex. 9, at 45:10–46:9. Murphy further indicated that he did not observe Davis on the ground with Hernandez's foot on his back when he arrived. Ex. 9, at 46:10–13. Murphy also insisted that he was the first one who spoke to Davis. Ex. 9, at 48:13–20.

After hearing argument from the parties, *see* Ex. 9, at 51:5–62:1, the trial court issued an oral ruling denying Davis's stop motion, *see* Ex. 9, at 62:2–67:7. The court determined that Officer Murphy's testimony was more credible than Davis's testimony. Ex. 9, at 62:2–21. According to the court, Davis's testimony was internally inconsistent, didn't make sense, and wasn't reasonable. The court did not believe Davis's story about the lost cell phone, remarking that it'd be strange for someone to think he left his cell phone somewhere and have an idea that maybe it was at a particular house.

Ultimately, the court concluded that the police were justified in stopping and questioning Davis based on the prior burglary incidents, the description of the burglar, and Davis's presence on the porch. Ex. 9, at 62:22–66:14. Relying on Murphy's testimony, the court found that Davis was descending the porch when Murphy told him to show his hands and asked for his name. The court also found that the police did not use any force during their encounter with Davis. As to the description of the burglar, the court noted that the police may have been unable to ascertain Davis's age as he stood on the porch. Ex. 9, at 65:1–66:6. (Davis was 45 at the time of the incident; the most recent victim said the burglar was in his mid-30s.)

The court also said it was unsurprising Davis was not wearing the same clothing the burglar wore during the most recent incident.

The hearing on the identification issue was spread over two dates. Milwaukee police officer Gary Cherone testified at the first hearing. *See* Ex. 10, at 7:5–29:21. Cherone indicated that on October 7, 2011, he conducted a photo array with Margaret, one of the burglary victims. Ex. 10, at 8:9–22. Cherone said he compiled the array using a recent photo of Davis and photos of five individuals who looked like him. Ex. 10, at 8:23–10:11. According to Cherone, he had another officer place each photo in a manilla folder; Cherone didn't know which folder contained Davis's photo. Ex. 10, at 10:12–11:5. Cherone indicated that he presented Margaret each folder one at a time, plus two blank folders at the end. Ex. 10, at 11:6–15, 18:2–10. Margaret said the person in folder number 3—Davis—was the one who robbed her. Ex. 10, at 18:11–24. However, Cherone said that the photo lineup sheet he used to conduct the array listed Davis's photo as being in the fourth folder. Ex. 10, at 11:20–15:16, 20:14–22:3.

Margaret testified at the second hearing. *See* Respt's Answer Ex. 11, ECF No. 6-11. She said that Officer Cherone presented her eight folders one-by-one and that the person who broke into her home was depicted in the third folder. Ex. 11, at 115:12–118:16, 125:8–126:12. Margaret indicated she had no doubt that was the person who robbed her.

The following day, the trial court issued an oral ruling denying Davis's identification motion. *See* Respt's Answer Ex. 13, at 4:6–11:25, ECF No. 6-13. The court was satisfied, based on the testimony of Officer Cherone and Margaret, that Margaret had chosen Davis's photo. Thus, the court declined to throw out Margaret's earlier identification or to prohibit Margaret from making an in-court identification at trial.

6

The matter proceeded to trial. *See* Ex. 11; Resp't's Answer Ex. 12, ECF No. 6-12; Ex. 13; Resp't's Answer Ex. 14, ECF No. 6-14; Resp't's Answer Ex. 15, ECF No. 6-15; Resp't's Answer Ex. 16, ECF No. 6-16; Resp't's Answer Ex. 17, ECF No. 6-17; Resp't's Answer Ex. 18, ECF No. 6-18. The four victims testified about the break-ins, and several officers testified about the police investigation, including the print analyses and the photo arrays. The State also introduced into evidence the photo arrays conducted with Charles, Margaret, and Oliver. The arrays for Charles and Oliver contained the photos and the manilla folders. However, the array for Margaret included only the photos.

During his closing argument, Davis's lawyer questioned Margaret's identification. *See* Ex. 16, at 43:6–54:20, 64:23–65:19. He claimed that Davis (then in his mid-40s) was much older than the man Margaret said robbed her (in his mid- to late-20s). He also suggested it was unclear if Margaret had chosen Davis's photo during the array, as the photo lineup sheet listed Davis in a different folder. Davis's lawyer noted that, because the police didn't have Margaret sign or initial the photo she selected, there was no way to verify her testimony.

During deliberations, the jury asked to see the photo arrays conducted with Oliver and Margaret. *See* Ex. 18, at 2:11–21. The State suggested that the jury should be told to rely on their memory but, if the actual photos were sent back, they should get everything: the photos, the folders, and Officer Cherone's report. Ex. 18, at 2:24–7:5. Davis's lawyer suggested that the photos and the folders be sent back but not the report. Ex. 18, at 7:7–8:10. Over Davis's objection, the trial court decided to send back only the photos. Ex. 18, at 7:7–17:1. In other words, for the Oliver array, the court removed the photos from their folders so that it was in the same form as the Margaret array.

The jury found Davis guilty of all five charges. *See* Ex. 17, at 3:6–7:25. He was sentenced to nine months in jail, seventeen years in prison, and four and a half years of extended supervision. *See* Respt's Answer Ex. 19, at 25:20–40:3, ECF No. 6-19. A judgment of conviction was entered in March 2013. *See* Respt's Answer Ex. 1, ECF No. 6-1.

## II.    State Post-Conviction and Appellate Proceedings

Davis filed a post-conviction motion alleging that he was entitled to a new trial because the State failed to disclose a report about the arrest prepared by Officer Hernandez, Officer Murphy committed perjury at the pretrial suppression hearing, his trial lawyer provided ineffective assistance of counsel, and the trial court impeded his ability to present a defense in the way it handled the photo arrays. Ex. 3, ¶ 17. The circuit court granted Davis a hearing on the motion. Hernandez, Murphy, and Davis testified at that hearing. *See* Respt's Answer Ex. 20, ECF No. 6-20.

Officer Hernandez testified that on October 3, 2011, he and other officers were out looking for a suspect who had committed several daytime burglaries on the east side of Milwaukee. Ex. 20, at 6:19–8:20. Hernandez said that, while on patrol, he observed a man who generally matched the description of the burglar on the porch of a residence. Ex. 20, at 8:21–9:10, 12:2–7. According to Hernandez, the man walked down the porch, appeared to see the squad car, stopped abruptly, walked back up the porch, knocked on the residence, left the porch, crossed the street, and walked toward a different house while furtively looking in the direction of the police. Hernandez indicated that he was suspicious of the man's behavior, so he asked the man to identify himself and explain what he was doing. Ex. 20, at 9:11–15, 10:23–11:6, 12:13–21. Davis gave the police his photo I.D. and said he was knocking on random doors looking for his friend Kevin. Ex. 20, at 18:25–19:18. Davis claimed that he was

8

playing poker with Kevin the previous night and that he left his cell phone at Kevin's house, but he didn't know Kevin's last name and wasn't sure of Kevin's address.

Officer Hernandez further testified that he made the initial stop and that Officer Murphy arrived within about five seconds. Ex. 20, at 10:11–22, 15:8–12, 21:14–22. On cross-examination, Hernandez was asked about a dispatch report that appeared to indicate Murphy arrived at the scene about five minutes after Hernandez did. Ex. 20, at 22:11–23:10. Hernandez explained that must have been a mistake and claimed that dispatch reports regularly contain minor errors. Ex. 20, at 23:11–32:14. Despite the times listed on the report, Hernandez insisted that Murphy arrived within seconds of Hernandez making the stop. Hernandez also insisted that he didn't pull out his gun or order Davis to the ground. Ex. 20, at 20:19–21:13.

Officer Murphy testified that he and Officer Hernandez arrived at the scene at about the same time and were standing next to each other when they interacted with Davis. Ex. 20, at 36:17–38:12. On cross-examination, Murphy said he couldn't recall whether he testified at the pretrial suppression hearing that he alone was the officer who initiated the stop. Ex. 20, at 46:3–14. Murphy also said he couldn't remember whether he and Hernandez pulled up together or if Hernandez made the initial contact. Ex. 20, at 48:25–49:4.

Like at the pretrial suppression hearing, Davis's testimony differed significantly from that of the officers. Davis said that, on the day of his arrest, he was looking for his lost cell phone. Ex. 20, at 52:16–53:10. He thought he might have left the phone at his friend's house the night before, but he couldn't remember exactly which house it was because it was dark outside at that time. Davis indicated that, after leaving the porch, Officer Hernandez approached him, ordered him to the ground at gunpoint, and placed his foot on Davis's back.

Ex. 20, at 53:10–14. According to Davis, Officer Murphy arrived "about five minutes later, as the [dispatch report] correctly illustrates," and retrieved Davis's wallet from his back pocket. Ex. 20, at 53:14–55:13. Davis insisted that Murphy wasn't there when Hernandez first stopped him; Davis said Murphy arrived "exactly five minutes" later. Ex. 20, at 54:21–55:6.

The circuit court denied Davis's post-conviction motion via an oral ruling. *See* Ex. 20, at 66:8–77:18. The court determined that the officers had reasonable suspicion to stop and question Davis because he was in the same area as the past burglaries at the same time of day they had been committed, he fit the general description of the burglar, and he was acting in a manner consistent with the past burglaries. Ex. 20, at 76:17–20. In reaching that finding, the court determined that the officers' testimony was more credible than Davis's testimony. The court noted that both officers indicated that they had arrived at the scene simultaneously. Ex. 20, at 69:9–12. According to the court, that testimony was consistent with Officer Murphy's testimony at the pretrial suppression hearing. Ex. 20, at 71:5–72:7. The court quoted Murphy's prior testimony directly: "[O]ther officers responded almost simultaneously [to me] because they were [also] in the area canvassing for [the] potential burglar." Ex. 20, at 71:23–25 (quoting Ex. 9, at 22:5–7). Given that the officers arrived at about the same time, the court wasn't concerned about which officer claimed to be first. *See* Ex. 20, at 72:8–16.

In contrast, the circuit court did not believe Davis's testimony. Ex. 20, at 69:13–71:4. The court noted that, at the pretrial hearing, Davis described a fast-moving event in which Officer Murphy arrived when Davis was on the ground with Officer Hernandez's foot on his back. However, at the post-conviction hearing, Davis indicated that Murphy arrived exactly five minutes after Hernandez did. The circuit court observed that Davis appeared to be conforming his post-conviction testimony to the times listed on the dispatch report; indeed,

10

Davis said that Murphy arrived about five minutes later—"which is exactly what it says on the [dispatch] report." Ex. 20, at 69:13–23. Given that inconsistency, the court also did not believe Davis's testimony about Hernandez ordering him to the ground at gunpoint. Ex. 20, at 72:17–73:8. The court further noted that Davis's explanation for why he was at the residence didn't check out, as the residents claimed they didn't know him. Ex. 20, at 76:21–25.

The circuit court also found that the trial court did not abuse its discretion in its handling of the photo arrays. *See* Ex. 20, at 66:15–68:5. The court noted that the jury essentially was asking to see the photos from two of the arrays, not the folders, and that's what the trial court gave them. The court further noted that the trial court listened to suggestions from both parties and reached a reasonable decision based on the evidence presented at trial.

Davis appealed, arguing that the circuit court's factual findings were clearly erroneous and that the circuit court erred in finding that the trial court did not violate his right to present a defense when it removed the Oliver array photos from their manilla folders. *See* Respt's Answer Ex. 2, ECF No. 6-2. The Wisconsin Court of Appeals first determined that the circuit court's credibility determinations were not clearly erroneous. *See* Ex. 3, ¶¶ 27–32.[2] The court indicated that Davis relied too heavily on Officer Murphy's testimony at the pretrial suppression hearing that he was the first one to approach Davis, noting that Murphy consistently testified that the other officers arrived simultaneous to him. The court also agreed with the circuit court that it was Davis, not the officers, who conformed his post-conviction testimony to the dispatch report. As to the second issue, the court determined that the trial

[2] *State v. Davis*, No. 2020AP1051-CR, 2021 WL 5071616, 2021 Wisc. App. LEXIS 984 (Wis. Ct. App. Nov. 2, 2021) (per curiam).

court's decision to remove the photos from their folders did not violate Davis's constitutional right to present a defense. Ex. 3, ¶¶ 33–39. The court found that the folders were not essential to Davis's defense concerning the photo arrays, which focused on whether Margaret had in fact selected his photo. Accordingly, the court affirmed the judgment of conviction and the order denying Davis's post-conviction motion.

Davis sought review by the Wisconsin Supreme Court, arguing that the State violated his constitutional right to be free from an unreasonable seizure and that the trial court violated his constitutional right to present a defense. *See* Respt's Answer Ex. 4, ECF No. 6-4. On March 16, 2022, the Wisconsin Supreme Court summarily denied Davis's petition for review. *See* Respt's Answer Ex. 5, ECF No. 6-5.[3] Davis did not seek certiorari review by the United States Supreme Court. *See* Pet. 4, ECF No. 1.

## III.    Federal Habeas Proceedings

In March 2023, Davis filed a petition for a writ of habeas corpus in federal district court. *See* Pet. After the respondent filed an answer, *see* ECF No. 6, Davis (who is represented by counsel) filed a brief in support of his petition, *see* ECF No. 8; the respondent filed a brief opposing the petition, *see* ECF No. 12; and Davis submitted a reply brief, *see* ECF No. 13. The matter was reassigned to me in June 2024 after all parties consented to magistrate-judge jurisdiction under 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73(b). *See* ECF Nos. 2, 11, 14.

## STANDARD OF REVIEW

The Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) governs Davis's petition. Under AEDPA, a prisoner in custody pursuant to a state-court judgment of conviction is entitled to federal habeas relief only if he is "in custody in violation of the

---

[3] *State v. Davis*, No. 2020AP1051-CR, 2022 Wisc. LEXIS 381 (Wis. Mar. 16, 2022).

Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). With respect to claims adjudicated on the merits in state court, a federal court can grant an application for a writ of habeas corpus "only if the state court's decision was contrary to clearly established Supreme Court precedent, involved an unreasonable application of such precedent, or was based on an unreasonable determination of the facts in light of the evidence presented in state court." *Promotor v. Pollard*, 628 F.3d 878, 888 (7th Cir. 2010) (citing 28 U.S.C. § 2254(d)); *see also White v. Woodall*, 572 U.S. 415, 419 (2014).

"A legal principle is 'clearly established' within the meaning of [28 U.S.C. § 2254(d)(1)] only when it is embodied in a holding of [the Supreme] Court." *Thaler v. Haynes*, 559 U.S. 43, 47 (2010) (citing *Carey v. Musladin*, 549 U.S. 70, 74 (2006); *Williams v. Taylor*, 529 U.S. 362, 412 (2000)). A state-court decision is "contrary to" clearly established federal law if "the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Williams*, 529 U.S. at 412–13 (opinion of O'Connor, J.). Similarly, a state-court decision results in an "unreasonable application" of clearly established federal law when that court either "identifies the correct governing legal rule from [Supreme Court] cases but unreasonably applies it to the facts of the particular state prisoner's case" or "unreasonably extends a legal principle from [Supreme Court] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply." *Id.* at 407.

A writ of habeas corpus may not issue under the "unreasonable application" clause "simply because the federal court concludes that the state court erred. Rather, the applicant must demonstrate that the state court applied the Supreme Court's precedent in an objectively

13

unreasonable manner." *Kubsch v. Neal*, 838 F.3d 845, 859 (7th Cir. 2016) (citing *Woodford v. Visciotti*, 537 U.S. 19, 24–25 (2002)). Thus, the petitioner "must show that the state court's ruling . . . was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fair-minded disagreement." *Id.* (quoting *Harrington v. Richter*, 562 U.S. 86, 103 (2011)).

"[A] state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance." *Wood v. Allen*, 558 U.S. 290, 301 (2010) (citing *Williams*, 529 U.S. at 411). For purposes of federal habeas review, state-court factual determinations are entitled to "substantial deference." *Brumfield v. Cain*, 576 U.S. 305, 313–14 (2015). To obtain relief under 28 U.S.C. § 2254(d)(2), a petitioner must demonstrate that the state-court decision "rests upon fact-finding that ignores the clear and convincing weight of the evidence." *McManus v. Neal*, 779 F.3d 634, 649 (7th Cir. 2015) (quoting *Goudy v. Basinger*, 604 F.3d 394, 399 (7th Cir. 2010)); *see also* 28 U.S.C. § 2254(e)(1). "The decision must be 'so inadequately supported by the record as to be arbitrary and therefore objectively unreasonable.'" *Alston v. Smith*, 840 F.3d 363, 370 (7th Cir. 2016) (quoting *Ward v. Sternes*, 334 F.3d 696, 704 (7th Cir. 2003)).

When applying the above standards, federal courts look to "the 'last reasoned state-court decision' to decide the merits of the case, even if the state's supreme court then denied discretionary review." *Dassey v. Dittmann*, 877 F.3d 297, 302 (7th Cir. 2017) (quoting *Johnson v. Williams*, 568 U.S. 289, 297 n.1 (2013)).

## DISCUSSION

Davis raises two potential grounds for relief in his petition. First, Davis claims that he was denied his Fourth Amendment right to be free from an unreasonable seizure when the

14

police stopped and arrested him on October 3, 2011. Second, Davis claims that he was denied his due process right to present a defense when the trial court provided the jury only the loose photos from the array Oliver viewed.

## I. *Stone v. Powell* Precludes the Court from Addressing the Merits of Davis's Fourth Amendment Claim

Davis challenges the police's initial stop, claiming that it was not supported by probable cause or reasonable suspicion. The respondent contends that *Stone v. Powell*, 428 U.S. 465 (1976), bars this court from reaching the merits of Davis's Fourth Amendment claim. Alternatively, the respondent maintains that, even if the court did address the merits, Davis would not be entitled to relief under § 2254.

Federal habeas review is very limited with respect to Fourth Amendment claims that already have been raised in state court. In *Stone v. Powell*, the Supreme Court held that "where the State has provided an opportunity for full and fair litigation of a Fourth Amendment claim, a state prisoner may not be granted federal habeas corpus relief on the ground that evidence obtained in an unconstitutional search or seizure was introduced at his trial." 428 U.S. at 494. The Seventh Circuit has interpreted *Stone* as barring federal habeas review of the merits of all Fourth Amendment claims, including where the state courts denied a pretrial suppression motion, if the petitioner has had a full and fair opportunity to litigate his claim in state court. *See, e.g.*, *Monroe v. Davis*, 712 F.3d 1106, 1112–13 (7th Cir. 2013); *Miranda v. Leibach*, 394 F.3d 984, 997 (7th Cir. 2005).

A petitioner has received a full and fair opportunity if "(1) he clearly apprised the state court of his Fourth Amendment claim along with the factual basis for that claim, (2) the state court carefully and thoroughly analyzed the facts, and (3) the court applied the proper constitutional case law to those facts." *Miranda*, 394 F.3d at 997 (citing *Pierson v. O'Leary*, 959

15

F.2d 1385, 1391 (7th Cir. 1992); *Cabrera v. Hinsley*, 324 F.3d 527, 531–32 (7th Cir. 2003); *Hampton v. Wyant*, 296 F.3d 560, 563–64 (7th Cir. 2002)). "A state court process that amounts to a sham," however, "would not constitute a full and fair hearing even though the petitioner had his day in court on the claim." *Monroe*, 712 F.3d at 1114 (citing *Cabrera*, 324 F.3d at 531–32; *Hampton*, 296 F.3d at 563–64). Similarly, a petitioner likely has not received a full and fair opportunity to litigate his claim if the state court's factual determinations "lack the fair support of the record," or if the state court committed an "egregious error" in resolving the Fourth Amendment issue. *Miranda*, 394 F.3d at 998 (citations omitted).

Although he was afforded several hearings on the issue, Davis argues that the state circuit court deprived him of a full and fair opportunity to litigate his Fourth Amendment claim in that it failed to carefully and thoroughly analyze the facts and apply the proper constitutional law to those facts. Specifically, Davis takes issue with the circuit court finding the officers' testimony more credible than his testimony. Officer Murphy testified at the pretrial suppression hearing that he was the one who first stopped and approached Davis. After trial, however, Davis obtained a police report purportedly showing that it was Officer Hernandez, not Murphy, who stopped Davis. Hernandez also testified at the post-conviction hearing that he initiated the stop. According to Davis, these developments demonstrate that Murphy falsely testified at the pretrial hearing. He accuses the circuit court of essentially ignoring Murphy's perjured testimony when the court made its credibility finding.

Contrary to Davis's suggestion, the circuit court carefully considered Officer Murphy's testimony at the two suppression hearings. The court accurately observed that Murphy did not claim at the pretrial hearing that he was alone when he made contact with Davis. *See* Ex. 20, at 71:5–72:16. While Murphy didn't mention Hernandez by name, the court noted

16

that Murphy testified on cross-examination—before Davis himself testified at the hearing—that "[o]ther officers responded almost simultaneously because they were in the area canvassing for a potential burglar." Ex. 20, at 71:23–25. The court also noted that both Murphy and Hernandez testified at the post-conviction hearing that they essentially arrived simultaneously. Ex. 20, at 69:11–12. The court reasonably determined, given the consistent testimony that the officers arrived at about the same time, that Murphy's prior statement about playing the lead role did not negatively impact his credibility concerning the circumstances of the stop.

Moreover, the state-court record adequately supports the circuit court's factual findings. The court astutely observed that Davis's post-conviction motion turned on credibility. *See* Ex. 20, at 68:6–69:2. The court noted that the officers consistently testified that they arrived almost simultaneously and that their interaction with Davis was cordial. *See* Ex. 20, at 69:3–76:25. In contrast, Davis consistently testified that Officer Hernandez immediately ordered him to the ground at gunpoint and placed his foot on Davis's back. The court noted that, at the pretrial suppression hearing, Davis never suggested there was any lag between Hernandez's arrival and Officer Murphy's arrival. Rather, Davis said Murphy "jumped out of his squad car and came up to the scene" while Davis was on the ground with Hernandez's foot on his back and Hernandez asking Davis what he was doing in the area. Ex. 20, at 69:24–70:18 (quoting Ex. 9, at 38:8–39:2). The court noted, however, that at the post-conviction hearing, Davis claimed that Murphy arrived "exactly" five minutes after Hernandez did, as it says on the dispatch report. *See* Ex. 20, at 53:10–17, 54:4–55:13, 69:13–20. The court reasonably determined, given Davis's inconsistent testimony, that he appeared to be conforming his post-conviction testimony to the dispatch report and that his testimony

about the circumstances of the stop—including Hernandez having his gun drawn, Davis being ordered to the ground, and Davis's story about his lost cell phone—was unbelievable. Ex. 20, at 69:13–71:4, 72:25–76:25. Thus, the record supports the circuit court's credibility findings.

There are other fatal flaws with Davis's argument. As suggested above, Officer Murphy's statement about initiating the stop does not appear to rise to the level of perjury. But even if it did, Davis fails to explain how a lie about such a minor detail invalidates the rest of Murphy's testimony. Davis also unjustifiably imputes Murphy's purportedly false testimony to Officer Hernandez. *See* Petr's Br. 4, 16 (arguing that the officers, plural, changed their stories). However, he doesn't offer any reason why the circuit court should have discredited Hernandez's testimony. Nor does he attempt to rehabilitate his own inconsistencies and unbelievable testimony. In other words, given the other testimony at the two hearings, the circuit court reasonably could have credited the officers' version of events even if Murphy misremembered, or worse lied, about who initiated the stop.[4]

In sum, Davis received a full and fair hearing on the merits of his Fourth Amendment claim in the Wisconsin courts. Davis presented his claim to every level of the state court system: a pretrial suppression motion before the trial court, a post-conviction motion seeking a new trial from the circuit court, appellate briefs to the Wisconsin Court of Appeals, and a petition for review by the Wisconsin Supreme Court. The trial and circuit courts held evidentiary hearings on the issue, at which the officers and Davis testified. And the trial, post-conviction, and appellate courts entertained and reached the merits of Davis's claim, carefully

---

[4] For these same reasons, Davis has not demonstrated that, even if I were to overlook the *Stone* procedural bar, he is entitled to habeas relief on the merits of his Fourth Amendment claim. *See* § 2254(e)(1) ("In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.").

18

and thoroughly analyzing the facts and applying the proper constitutional law to those facts. While Davis disagrees with the circuit court's factual findings, he hasn't shown that the court's credibility determinations lack the fair support in the record or that the court committed an egregious error in resolving his Fourth Amendment claim. "[A] 'full and fair opportunity' guarantees only 'the right to present one's case.'" *Watson v. Hulick*, 481 F.3d 537, 542 (7th Cir. 2007) (quoting *Cabrera*, 324 F.3d at 531–32). "[I]t does not guarantee a correct result." *Cabrera*, 324 F.3d at 532. The record here shows that Davis was afforded a full and fair *opportunity* to present his Fourth Amendment claim in state court, and he does not identify any "subversion" of the state-court hearing process. *See id.* at 531. *Stone* therefore precludes me from reaching the merits of Davis's Fourth Amendment claim.

## II.    Davis Is Not Entitled to Federal Habeas Relief on His Due Process Claim

Davis also claims that the trial court denied his due process right to present a defense in the way it handled the photo array evidence. During trial, the State introduced the photo arrays conducted with three of the alleged burglary victims: Charles, Margaret, and Oliver. The arrays for Charles and Oliver contained the photos and the manilla folders that held the photos; however, the array for Margaret included only the loose photos. During closing arguments, Davis's lawyer questioned Margaret's identification, arguing that she chose folder three but the photo lineup sheet listed Davis's photo in the fourth position. During deliberations, the jury asked to see the arrays conducted with Oliver and Margaret. Over Davis's objection, the trial court removed the Oliver array photos from their manilla folders and sent the jury only the loose photos. Davis contends that the trial court's modification of the photo array evidence severely undermined his theory of defense because it implied that folders were not used in either array.

19

As explained above, to obtain federal habeas relief Davis must demonstrate that the last reasoned state-court decision denying his claim on the merits was contrary to Supreme Court precedent, involved an unreasonable application of Supreme Court precedent, or was based on an unreasonable determination of the facts in light of the evidence presented in state court. *See* § 2254(d). Here, that's the decision of the Wisconsin Court of Appeals, which held that the trial court's handling of the photo arrays did not violate Davis's right to present a defense. *See* Ex. 3, ¶¶ 33–39. Davis, however, focuses his due process argument on the trial court's actions. He does not mention the state appellate court's decision anywhere in the argument section of his initial brief. *See* Petr's Br. 21–23. Davis therefore has not developed an argument that he is entitled to relief under § 2254. *See Badelle v. Correll*, 452 F.3d 648, 659, 664 (7th Cir. 2006) (affirming the denial of federal habeas relief where the petitioner "failed to even reference the existence of the state court's decision" or address the state court's holding).

Davis's due process claim also fails on its merits. The Wisconsin Court of Appeals explained that the exclusion of evidence violates the right to present a defense only if the proffered evidence was "essential to" the defense. Ex. 3, ¶ 34 (quoting *State v. Williams*, 2002 WI 58, ¶ 70, 644 N.W.2d 919, 933–34). Although the court cited only state cases, its recitation is consistent with federal law. *See, e.g.*, *Hinkle v. Neal*, 51 F.4th 234, 243–44 (7th Cir. 2022) (explaining that the exclusion of evidence violates the Constitution only if the excluded evidence was "essential to the defendant's ability to present a defense") (citation and internal quotation marks omitted). Thus, the state appellate court's decision is not contrary to clearly established Federal law.

The Wisconsin Court of Appeals also reasonably applied that law to the facts of Davis's case. The court reasonably determined that the manilla folders in the photo array that Oliver viewed were not essential to Davis's defense, which focused on which photo Margaret selected in the array she was shown. Ex. 3, ¶¶ 35–36. The court correctly observed that Davis did not object to the State introducing only the photos, and not the folders, for the Margaret array. The court further noted that Davis failed to explain how or why the folders were integral to his defense. Ex. 3, ¶¶ 37–38. In other words, the court determined that the fact that the folders for the Oliver array were not sent back to the jury did not in any way undermine Davis's ability to argue that Margaret did not pick his photo out of the array. That finding was not objectively unreasonable.

Finally, the Wisconsin Court of Appeals' decision was not based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings. The court correctly observed that the State did not introduce into evidence the folders for the Margaret array, that Davis's lawyer argued during closing arguments that Margaret's identification was unreliable, that the jury asked to see the photo arrays conducted with Oliver and Margaret, and that, after consulting with the parties, the trial court removed the photos in the array that Oliver viewed from the folders and sent the jury only the loose photos from both the Oliver array and the Margaret array. *See* Ex. 3, ¶¶ 14–15, 36. Davis does not take issue with any of the state court's factual findings concerning his due process claim. *See* Petr's Reply 8–9 (arguing only that the state court unreasonably applied federal constitutional law).

Accordingly, Davis is not entitled to habeas relief on his due process claim.

**CERTIFICATE OF APPEALABILITY**

Pursuant to Rule 11 of the Rules Governing Section 2254 Cases, "[t]he district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant." A certificate should be issued only where the petitioner "has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). Davis has not demonstrated that "that jurists of reason could disagree with the . . . court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *See Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003) (citing *Slack v. McDaniel*, 529 U.S. 473, 484 (2000)). I will therefore deny a certificate of appealability.

**CONCLUSION**

In sum, *Stone v. Powell* precludes the court from addressing the merits of Davis's Fourth Amendment claim, and Davis has not demonstrated that he is entitled to federal habeas relief on his due process claim. Accordingly, the court **DENIES** the petition, ECF No. 1, and **DISMISSES** this action. The court also **DENIES** a certificate of appealability. The clerk of court shall enter judgment accordingly.

**SO ORDERED** this 25th day of October, 2024.

_____
STEPHEN C. DRIES
United States Magistrate Judge